STATE OF MAINE
CUMBERLAND, ss.

STATE OF MAINE
Cumberland. ss, Clerk's Office

JUN 30 2014

` RECEIVED

SUPERIOR COURT
CIVIL ACTION
Docket No. CV-12-336
RAC-CUM-06-30-14

ROBERT JONES,

Plaintiff

ORDER

v.

CHALMERS INSURANCE AGENCY,

Defendant

Pursuant to Maine Rules of Civil Procedure 56 and 12(b)(6) Defendant Chalmers

Insurance Agency ("Chalmers") has moved for summary judgment against Plaintiff Robert Jones

on all six of the claims in his Amended Complaint. Count I is for negligence; Count II is for

negligence (special relationship); Count III is for negligent misrepresentation; Count IV is for

breach of contract; Count V is for equitable estoppel; and Count VI is for promissory estoppel.

After reviewing the parties' memoranda and statements of material facts, the summary judgment

record, and hearing oral arguments on the Motion, the court has come to the conclusions detailed

below.

As an initial matter, however, there are several procedural matters for this court to

address. The court notes that the Defendant's Reply contains not only its memorandum as

contemplated by M.R. Civ. P. 7(f), but an additional memorandum with Defendant's Reply

Statement of Material Facts spanning more than 10 pages on Defendant's general objections

concerning expert witness Howard Candage's affidavit. As much as the Defendant has attempted

to paint this memorandum as a part of its Reply Statement of Material Facts and as compliant

with M.R. Civ. P. 56(h)(3), this court disagrees. Rule 56(h)(3) contemplates a "separate, short, and concise response". The court thereby notes Defendant's objections to the court's consideration of the Candage Affidavit as mentioned repeatedly in Defendant's specific replies to statements of material fact, but the court is not considering what is for all purposes Defendant's additional memorandum.

The court, however, is not allowing the Candage Affidavit to be introduced for summary judgment purposes, nor is the court accepting the Plaintiff's statements that rely upon the Candage Affidavit. In his affidavit, Mr. Candage represents that he was not asked whether $1 million worth of coverage could have been procured for a motorcycle between 2007 and 2010 in Maine. (D.S.M.F. ¶¶ 58-59; PO.S.M.F. ¶¶58-59; Candage Aff. ¶ 6.) This is inaccurate, as Mr. Candage was asked directly about the availability of $1 million worth of coverage for a motorcycle between 2007 and 2010, and he did not know the answer. (D.S.M.F. ¶¶ 58-59; PO.S.M.F. ¶¶58-59; Candage Aff. ¶ 6.) In addition, Mr. Candage's affidavit also appears to be unreliable as it relies in part on hearsay. (Candage Aff. ¶ 9.)

The court is also only considering the portions of Plaintiff's Response that comply with Rule 56(i)(ii). The court is not considering the pages of additional argument presented in the Plaintiff's Response, or the Defendant's objection thereto. Nor is the court considering Exhibit A attached to the Plaintiff's Response, which was not introduced through a statement of material fact. The court is also not considering the Plaintiff's Supplement to the Motion for Summary Judgment. The Plaintiff and Defendant have both objected to one another's submissions as impermissible under Rule 56, while continuing to add more filings, which in turn are impermissible under Rule 56. This court has only considered those filings that are contemplated by Rule 56, and those statements of material fact that are properly supported by record citations

as required by the Rule. Plaintiff's attempt in its Response to Defendant's Reply to remedy its failure to provide citations for certain paragraphs in it Opposing Statements of Material Facts is not curative.

## I.   FACTUAL BACKGROUND

The following facts are gathered from the Defendant's Statement of Material Facts (D.S.M.F.), the Plaintiff's Opposing Statement of Material Facts (O.S.M.F.) and Additional Statement of Material Facts (A.S.M.F.), and the Defendant's Reply Statement of Material Facts (R.S.M.F.).[1] Objections and responses thereto have been considered.

Mr. Jones owns a telecommunications contracting company called Maine Link Communications ("Maine Link"). (D.S.M.F. ¶ 11; O.S.M.F. ¶ 11.) As a part of his business, Mr. Jones's clients sometimes require that he provide certificates of liability insurance. (D.S.M.F. ¶ 42; O.S.M.F. ¶ 42.) Mr. Jones cannot remember any clients inquiring into or requiring uninsured or underinsured motorist coverage. (D.S.M.F. ¶ 45; O.S.M.F. ¶ 45.)

In 2007, part owner/manager and producer for Chalmers, Jim Chalmers, contacted Mr. Jones to solicit Maine Link's business.[2] (D.S.M.F. ¶¶ 12, 17; O.S.M.F. ¶ 12, 17.) Prior to September 2007, Jim and Mr. Jones met in Scarborough. (D.S.M.F. ¶ 14; O.S.M.F. ¶ 14.) At that point, with the exception of his motorcycle insurance, HRH Willis had Mr. Jones's insurance business. (D.S.M.F. ¶ 15.) Mr. Jones was not told by HRH Willis that his motorcycles were covered under his business policy, nor did he discuss the scope of his drive other car coverage with anyone there, but he believed his business policy there covered his motorcycles.[3] (D.S.M.F. ¶¶ 28, 30;

---

[1] Because of some confusion and disparity regarding the numbering across documents, the court notes that it is following the numbering explained in Defendant's Reply. (*See* Def.'s Reply 2 n. 2.)

[2] Maine Link had some contact with Chalmers in 2001, but it is unclear from the record what the extent of the contact was and it appears to have been through Mr. Jones's ex-wife. (D.S.M.F. ¶ 78; R.S.M.F. ¶78; O.S.M.F. ¶ 15; Def.'s Objection ¶ 15.)

[3] The summary judgment record is contradictory regarding whether or not Mr. Jones discussed his motorcycles with anyone at HRH Willis.

3

O.S.M.F. ¶ 28, 30.) Mr. Jones believed that drive any (or other) car insurance coverage was a type of insurance that "'covered [his] license for whatever [he] drove'". (D.S.M.F. ¶ 28; O.S.M.F. ¶ 28.)

When they met for the first time, Jim Chalmers learned about Mr. Jones's insurance with HRH Willis. (D.S.M.F. ¶ 18; O.S.M.F. ¶ 18.) When the two met for a second time, Mr. Jones decided to buy his commercial insurance through Chalmers. (D.S.M.F. ¶ 21; O.S.M.F. ¶ 21.)

Mr. Jones only recalls one meeting with Jim Chalmers, and he does not remember whether or not they went through the HRH Willis policy that he was asking Jim Chalmers to replace, nor does he remember asking Jim Chalmers for coverage that was not contained in the HRH Willis policy. (D.S.M.F. ¶¶ 23-25.) Mr. Jones cannot remember any particular conversations with Jim Chalmers regarding his motorcycles. (D.S.M.F. ¶ 50; O.S.M.F. ¶ 50.) Mr. Jones states that he said that he needed to be "bulletproof", which Jim Chalmers denies.[4] (A.S.M.F. ¶ 83; R.S.M.F. ¶ 83.) Mr. Jones also avers that he said to Jim Chalmers that he wanted his license insured for anything he drives or could be driving to work. (A.S.M.F. ¶ 84.) Jim Chalmers cannot remember Mr. Jones saying something along the lines of "insure my license". (R.S.M.F. ¶ 84.) Jim Chalmers was aware that Maine Link required certificates of insurance to provide to clients showing $1 million worth of coverage. (A.S.M.F. ¶ 89.)

Jim did not sell any personal policies to Mr. Jones, and Mr. Jones only recalls that Jim replaced the coverage he had in his policy through HRH Willis. (D.S.M.F. ¶¶19, 25; O.S.M.F. ¶¶ 19, 25.) The business policy that Jim provided through OneBeacon increased the uninsured /underinsured motorist coverage from $500,000 to $1,000,000 to match the liability coverage. (A.S.M.F. ¶ 85; R.S.M.F. ¶ 85.) Mr. Jones cannot remember discussing or specifically requesting

---

[4] The court notes it is unclear from the summary judgment record when and how Mr. Jones told Jim Chalmers that he needed to be "bulletproof".

4

uninsured motorist coverage prior to his accident. (D.S.M.F. 31; O.S.M.F. ¶ 31.) Chalmers sent

out certificates of insurance to Maine Link customers, representing that there was liability

insurance for "any auto." (D.S.M.F. ¶¶ 66-67.) Plaintiff's expert witness, Howard Candage, was

uncritical of the certificates of insurance issued by Chalmers. (D.S.M.F. ¶ 66.) He viewed the

certificates as an appropriate representation of Maine Link's coverage, and he believed that the

certificates did not address underinsured motorist coverage. (D.S.M.F. ¶¶ 66-67; O.S.M.F. ¶ 67.)

In September of 2007, Mr. Jones supplied Chalmers with a list naming the vehicles registered

to Maine Link that would be covered under his business auto policy. (D.S.M.F. ¶ 33; O.S.M.F. ¶

33.) Mr. Jones was aware that he had to notify his insurance agent when he was deleting a

vehicle and adding another vehicle to his policy, as he knows that the insurance company wants

a premium for every vehicle it covers. (D.S.M.F. ¶¶ 38-40; O.S.M.F. ¶¶ 38-40.) At the time, Mr.

Jones' only personal vehicles were his motorcycles. (D.S.M.F. ¶ 34; O.S.M.F. ¶ 34.) Mr. Jones

always insured his motorcycles separately from his business, and he never discussed registering

the motorcycles to his business, as the motorcycles were collector's bikes and he did not want

them wrapped up with the business. (D.S.M.F. ¶¶ 35-36; O.S.M.F. ¶¶ 35-36.)

In November of 2008, when Mr. Jones' daughter ran into a problem with her insurance

coverage, and Mr. Jones requested help, Mr. Jones's daughter Jessica Jones was added to the

Maine Link policy. (A.S.M.F. ¶ 80-81; R.S.M.F. ¶ 80.)

After Mr. Jones bought his business insurance through Jim Chalmers, his contact at the

agency changed to Lena Murch.[5] (D.S.M.F. ¶ 51; O.S.M.F. ¶ 51.) Mr. Jones never reviewed his

business policy with Ms. Murch on a coverage-by-coverage level, and prior to the accident he

---

[5] The court notes that while Mr. Jones' mother, Lois, was the receptionist at Chalmers for 17-18 years, she was uninvolved in Mr. Jones's insurance policy, and Mr. Jones did not depend upon her for any aspect of his insurance coverage. (D.S.M.F. ¶ 48; O.S.M.F. ¶ 48.)

never discussed coverage for motorcycles with Ms. Murch. (D.S.M.F. ¶¶ 52-53; O.S.M.F. ¶ 52.) Ms. Murch agreed that she had an obligation to Mr. Jones, as well as Maine Link. (A.S.M.F. ¶ 79; R.S.M.F. ¶ 79.)

Jim Chalmers, Ms. Murch and Lorna Richardson were aware that Mr. Jones drove a motorcycle. (A.S.M.F. ¶ 86.) Mr. Jones visited his mother at the Chalmers office, and when he did so he would be riding his motorcycle. (A.S.M.F. ¶ 77.) Jim Chalmers was aware that Mr. Jones was driving his motorcycle to work. (A.S.M.F. ¶ 86.) In April of 2010, Jim emailed Mr. Jones in the afternoon stating, "'I hope you are out on your bike enjoying the day!'"(A.S.M.F. ¶ 87.)

As of September 20, 2010 the Chalmers website included a statement called "The Chalmers' Customer Bill of Rights." (PSMF ¶ 106.) In the Bill of Rights, Chalmers claimed that it would explain to customers insurance coverages and options. (PSMF ¶ 106.) Chalmers recommended that customers use independent agents to confirm that "'the right products are in place to cover you and your family.'" (PSMF ¶ 106.) The Plaintiff has provided no evidence that Mr. Jones ever visited the Chalmers website.

On Saturday, September 25, 2010, Mr. Jones was driving his personally owned motorcycle and was horribly injured in a collision with a car. (D.S.M.F. ¶¶ 1-2; O.S.M.F. ¶¶ 1-2; A.S.M.F. ¶ 102.) Mr. Jones's girlfriend, Cindy Normand, was accompanying Mr. Jones on the back of his bike. (D.S.M.F. ¶ 2; O.S.M.F. ¶ 2.) The two were not driving to work, and Mr. Jones was not acting in the course of his employment during the ride. (D.S.M.F. ¶ 3; O.S.M.F. ¶ 3.) The motorcycle Mr. Jones was driving that day was kept at his home and registered to him, and it was insured along with a second motorcycle through a policy with Dairyland Insurance Company ("Dairyland"). (D.S.M.F. ¶¶ 5, 7, 9; O.S.M.F. ¶¶ 5, 7, 9.) The policy was not issued

6

through Chalmers. (D.S.M.F. ¶¶ 7, 8.). Following the accident, Ms. Murch suggested that Mr. Jones pursue a claim with OneBeacon. (A.S.M.F. ¶ 103.) The court surmises from the Complaint that Mr. Jones had damages of over $1 million, and that the party who caused the accident had a liability limit of $100,000. Mr. Jones' underinsured motorist claim to OneBeacon was denied. Mr. Candage agreed that regardless of whether or not there was a drive other car endorsement in the policy, the business auto policy would not provide either liability or underinsured motorist coverage when a privately owned motorcycle was being used for personal activities that are not in the course of business. (D.S.M.F. ¶ 64.) OneBeacon and Mr. Jones eventually reached a settlement amounting to $95,000.00. (D.S.M.F. ¶ 41; O.S.M.F. ¶ 41.)

## II.    STANDARD OF REVIEW

"Summary judgment is appropriate when the record reveals no issues of material fact in dispute. A fact is material if it has the potential to affect the outcome of the case." *Lepage v. Bath Iron Works Corp.*, 2006 ME 130, ¶ 9, 909 A.2d 629 (citations omitted).

The Law Court has held that "[s]ummary judgment is properly granted if the facts are not in dispute or, if the defendant has moved for summary judgment, the evidence favoring the plaintiff is insufficient to support a verdict for the plaintiff as a matter of law." *Curtis v. Porter*, 2001 ME 158, ¶ 7, 784 A.2d 18; *see also Houde v. Millett*, 2001 ME 183, ¶ 11, 787 A.2d 757. If "a defendant moves for summary judgment, the plaintiff 'must establish a *prima facie* case for each element of her cause of action' that is properly challenged in the defendant's motion." *Curtis*, 2001 ME 158, ¶ 8, 784 A.2d 18 (quoting *Champagne v. Mid-Maine Med. Ctr.*, 1998 ME 87, ¶ 9, 711 A.2d 842); *see also Corey v. Norman, Hanson & DeTroy*, 1999 ME 196, ¶ 9, 742 A.2d 933.

When considering a Motion for Summary Judgment, this court must admit uncontroverted facts from the statement of material facts that are properly supported. M.R. Civ. P. 56(h)(4). This court cannot consider parts of the record that were not properly referenced in a statement of material facts. *See* M.R. Civ.P. 56(h)(4) ("The court shall have no independent duty to search or consider any part of the record not specifically referenced in the parties' separate statement of facts."); *see also HSBC Bank USA, N.A. v. Gabay*, 2011 ME 101, ¶ 17, 28 A.3d 1158.

## III.   DISCUSSION

### a. Negligence, Negligence (Special Relationship), and Causation

To prevail on a claim for negligence, a plaintiff must demonstrate a duty of care, breach of the duty of care, injury, and causation between the breach of the duty of care and the injury. *See Estate of Smith v. Cumberland Cnty.*, 2013 ME 13, ¶ 16, 60 A.3d 759.

The Law Court has held that "[a]n insurance agent generally assumes only those duties found in an ordinary agency relationship, that is, to use reasonable care, diligence and judgment in obtaining the insurance coverage requested by the insured party." *Szelenyi v. Morse, Payson & Noyes Ins.*, 594 A.2d 1092, 1094 (Me. 1991) (citations omitted). A greater duty to give advice or information regarding the adequacy of insurance coverage is only applied if there is "a special relationship or agreement between the parties." *Id.* at 1095. "An insurance agent does not have a duty to advise an insured about adequacy of coverage merely because an agency relationship exists between the parties. Before such a duty can arise, a special agency relationship must exist between the parties." *Id.* at 1094. The Law Court noted that an "agent's duties are based on the manifestations of consent of the parties and ordinarily must be inferred from the parties' conduct." *Id.*

8

To establish causation, a Plaintiff is required to "allege that, but for the defendant's acts, the resulting outcome for the plaintiff would have been both different, and more favorable." *Tri-Town Marine, Inc. v. J.C. Milliken Agency, Inc.*, 2007 ME 67, ¶ 10, 924 A.2d 1066. While the Law Court has discussed whether "proof of better alternative coverage in failure to procure insurance cases is required" and has stated that there is "abundant authority" to suggest that it is, it has reserved judgment on that issue. *Id.*

1. Negligence

Mr. Jones' negligence claim alleges that Chalmers breached its duty of care by failing to procure the insurance coverage Mr. Jones requested. This court finds that there are genuine issues of material fact precluding a summary judgment on Count 1 of the Amended Complaint.

Mr. Jones has averred that when he discussed his insurance coverage with Jim Chalmers he stated that he wanted to be "bulletproof" and he wanted his "license insured". This court believes that based on these assertions, viewed in the light most favorable to the Plaintiff, the Plaintiff has raised a genuine issue of material fact as to whether he requested an insurance policy that would cover everything he drove. If a fact-finder were to accept Mr. Jones's statements, a fact-finder could find that to have acted reasonably and diligently in procuring the correct coverage, Jim Chalmers should have inquired into what Mr. Jones meant when he said he wanted to be bulletproof and have his license insured. A fact-finder could also find that Chalmers should have procured a more extensive policy for Mr. Jones. Mr. Candage's testimony has also raised the question of whether Chalmers should have asked additional questions of Mr. Jones before replacing his policy.[6]

---

[6] From the fact that Ms. Murch recommended that Ms. Jones pursue a claim against OneBeacon, a fact-finder might surmise that it is unclear whether Chalmers even knew the extent of the coverage it had provided for Mr. Jones.

9

The court acknowledges that there are concerns regarding Mr. Jones' claim. For instance, while Count 1 of the Complaint alleges that "Mr. Jones requested of Defendant that he be provided with $1 million worth of coverage on everything he drove, which included his motorcycle . . . ," this exact assertion is not supported in the summary judgment record. (Pl.'s Am. Compl. ¶ 43.) Nor does the summary judgment record support that Mr. Jones's specifically requested $1 million in underinsured motorist coverage on everything he drove, including his motorcycle. (*Id.* at ¶ 44.) Mr. Jones' purported requests lacked specificity, and are called into question by the Defendant. At the same time, however, this court bears in mind that "[i]f material facts are disputed, the dispute must be resolved through fact-finding, even though the nonmoving party's likelihood of success is small." *Curtis v. Porter*, 2001 ME 158, ¶ 7, 784 A.2d 18.

In this instance what exactly Mr. Jones requested of Jim Chalmers is in dispute. This factual issue bears on whether or not Jim Chalmers breached his duty to use reasonable care, diligence, and judgment to procure the insurance coverage requested by Mr. Jones. This dispute should be decided by the fact-finder, not this court at the summary judgment stage.

2. Negligence (Special Relationship)

The negligence special relationship claim alleges that Mr. Jones and Chalmers had a special relationship, which imparted a duty upon Chalmers to advise Mr. Jones regarding the adequacy of his insurance coverage, and that Chalmers knew Mr. Jones was driving his motorcycle to work and should have advised Mr. Jones that his business policy did not provide him with $1 million in coverage for his motorcycle. The Plaintiff contends that this failure to advise Mr. Jones caused him damages. The Defendant has contested the Plaintiff's claim, and argues that Chalmers and Mr. Jones did not have a special relationship.

10

Since the duty to advise only arises out of a special relationship, a plaintiff must provide facts that suggest that there was a special relationship between the parties. The Law Court has not clarified what would constitute a special relationship in the insurance context.[7] In *Szelenyi*, the Law Court overturned a jury verdict for the insured and found that while the insurance agency had a 12-year relationship with the insured, it did not have a special agency relationship with the insured, nor did it have an implied agency agreement to advise him on the adequacy of his coverage. *Szelenyi*, 594 A.2d 1092 (Me. 1991) Thereby, the insurance agency was not liable to the insured for failing to advise him as to the adequacy of his coverage. *Id.*

*Szelenyi* is distinguishable from this case, however, as the plaintiff, a doctor with professional malpractice insurance, never presented evidence that he asked for or received advice from his insurer about the adequacy of his insurance. *Id.* at 1094. While the doctor had a 12-year relationship with his insurance company, his interactions with the insurance company were extremely limited. *Id.* at 1094-1095. In this instance, Mr. Jones and Jim Chalmers met twice to discuss Mr. Jones's commercial policy. Chalmers also assisted Mr. Jones insurance regarding his daughter's insurance situation. In addition, Mr. Jones appears to have had more interaction with agents at Chalmers than the plaintiff in *Szelenyi*. Mr. Jones would stop in to see his mother at the Chalmers' office. Three of the agents at Chalmers were aware that Mr. Jones drove a motorcycle, and Jim Chalmers was aware that Mr. Jones drove his motorcycle to work. Chalmers insurance

---

[7] Chalmers cites to cases in other areas of law where special relationships are characterized by placement of trust, disparities of power, closeness of the relationship, or control held by the person with a fiduciary duty. *See Fortin v. Roman Catholic Bishop of Portland,* 2005 ME 57, ¶¶ 37-39, 871 A.2d 1208 (finding, dependent upon factual support, a special relationship between a child who had extensive involvement with the church and a Catholic diocese as his fiduciary); *see also Dragomir v. Spring Harbor Hosp.,* 2009 ME 51, ¶¶ 17-21, 970 A.2d 310 (holding that mental health patient of psychiatric hospital had alleged facts that, if demonstrated, would constitute a special relationship between himself and the hospital under § 315(b) of Restatement (Second) of Torts)). Chalmers and Mr. Jones's relationship is of course not comparable to the special relationships in these types of cases. The court notes, however, that both *Fortin* and *Dragomir* involved finding a special relationship under § 315(b). *Id.* The court explained in *Dragomir* that "Section 315(b) uses the term "special relation" in a narrower senses than it is traditionally used." 2009 ME 51, ¶ 18, 970 A.2d 310. Determining, in the insurance context, a special agency relationship giving rise to a duty to advise does not seem comparable to finding a special relationship in the cases that Chalmers has cited.

11

issued certificates of liability for Mr. Jones. Jim Chalmers had a close enough relationship, that Jim Chalmers emailed Mr. Jones with a friendly message about riding his motorcycle. Lastly, Mr. Jones has alleged that he made statements to Chalmers that he wanted to be bulletproof and he wanted his license insured, suggesting that he would want policies that were all encompassing. [8]

The Defendant argues that there was no special agency relationship between Mr. Jones and Chalmers, nor was there an agreement for Chalmers to provide Mr. Jones insurance advice. Chalmers asserts that there is no evidence that Mr. Jones solicited advice from Chalmers regarding the adequacy of Mr. Jones' insurance coverage generally, or with respect to his motorcycles or personally owned and operated vehicles. Mr. Jones cannot remember any discussion regarding motorcycles or uninsured motorist coverage with Chalmers.

The Superior Court in *Morse Bros. Inc.* interpreted *Szelenyi* to require that a court "review the course of dealings between the parties in order to determine the existence of a special agency relationship, and must look for evidence that the parties had agreed that the agency would give advice regarding the adequacy of insurance coverages." *Morse Bros. Inc. v. Desmond & Payne, Inc.,* 2005 WL 1845167 *6 (Me. Super. Apr. 22, 2005) (holding that while the parties had a long-term relationship, there was no evidence that the insurance agent agreed to give the plaintiffs advice about the adequacy of their insurance coverage, and thereby the relationship between the parties was simply a normal agent-insured relationship.)

In *Chapman v. Metropolitan Cas. Ins. Co.,* the Superior Court found that there was a factual dispute as to whether a special relationship was created when an insurance agent visited

---

[8] At this juncture, the court is unconvinced that the statements on Chalmers' website created any sort of special relationship with the Plaintiff. The Plaintiff has presented no evidence that Mr. Jones ever viewed the website, much less relied on the website when he decided to purchase his insurance coverage through Chalmers or continue his insurance coverage with Chalmers. As a result, this court considers the website immaterial.

the plaintiffs' home and allegedly stated that the plaintiffs had "good coverage". 2004 WL 237714 (Me. Super. Jan. 15, 2004). The court denied summary judgment on the negligent failure to advise count given the contested facts regarding the meeting between the agent and the plaintiffs, and the possibility that a jury could find a special relationship. *Id.*

Based upon the evidence that Mr. Jones has presented, including his alleged statements to Chalmers and the assistance Chalmers provided to Mr. Jones with Jessica Jones' insurance problem, it is possible that a jury could find that Mr. Jones and Chalmers had a special agency relationship. Mr. Jones has raised genuine issues of material fact regarding whether there was a special relationship between himself and Chalmers creating a duty to advise the plaintiff about his coverage, and whether Chalmers breached that duty by failing to advise Mr. Jones.

### 3. Causation

The court notes Defendant's attack upon the Plaintiff's negligence claim, breach of contract claim, and promissory estoppel claim (the failure to procure claims) based on the element of causation. More specifically, the Defendant has questioned whether the Plaintiff can show it would have been possible to obtain $1 million worth of uninsured motorist coverage for his motorcycle on a business policy. The Defendant has not explicitly questioned the Plaintiff's proof of the element of causation on other grounds (i.e. whether the lack of coverage for his motorcycle through the business policy caused the Plaintiff damages). The Plaintiff should be aware of its need to prove causation at trial. While *Tri-Town Marine* did not impart a specific obligation to prove better alternative coverage, this court reads that opinion to indicate that proof of better alternative coverage may be deemed necessary in the future. 2007 ME 67, ¶ 9, 924 A.2d 1066. In *Tri-Town Marine* the Court cited a Superior Court case requiring proof of the availability of coverage, *Bangor–Brewer Bowling Lanes, Inc. v. Commercial Union–York*

13

*Insurance Co.*, 2001 Me.Super. LEXIS 174, \*\*14–15 (July 3, 2001), as well as cases from a number of other jurisdictions, and stated that the "vast majority of other jurisdictions require such proof in failure to procure cases." *Id; see, e.g., Bayly, Martin & Fay, Inc. v. Pete's Satire, Inc.*, 739 P.2d 239, 244 (Colo.1987); *Am. Motorists Ins. Co. v. Salvatore*, 102 A.D.2d 342, 476 N.Y.S.2d 897, 900 (N.Y.App.Div.1984). At this point, the court believes that it is best for this issue to go to trial where the parties can provide their evidence regarding causation to the jury.

b. **Negligent Misrepresentation**

The Restatement (Second) of Torts provides the following definition for negligent misrepresentation, which has been adopted by the Law Court:

> One who, in the course of his business, profession or employment, or in any other transaction in which he has a pecuniary interest, supplies false information for the guidance of others in their business transactions, is subject to liability for pecuniary loss caused to them by their justifiable reliance upon the information, if he fails to exercise reasonable care or competence in obtaining or communicating the information.

Restatement (Second) of Torts § 552(1) (1977); *see Chapman v. Rideout*, 568 A.2d 829, 830 (Me. 1990). It is up to the fact-finder to decide whether the party has failed to exercise the care or competence of a reasonable person. *Rand v. Bath Iron Works Corp.*, 2003 ME 122, ¶ 13, 832 A.2d 771 (holding "unlike fraud or deceit, the defendant's knowledge is largely immaterial for negligent misrepresentation, and the fact-finder's primary task is to ascertain whether the defendant's conduct was reasonable.")

Jones' negligent misrepresentation claim is based on 1) the certificates of liability insurance provided by Chalmers, and 2) apparent statements Chalmers made when Mr. Jones' daughter Jessica was added to the business insurance policy.[9] Chalmers contends that certificates

---

[9] The court notes that while Mr. Jones claims that Chalmers issued certificates of liability insurance stating that Mr. Jones had $1 million worth of coverage on any auto, and that Mr. Jones was copied when the certificates of liability

14

of liability insurance are in no way representations regarding uninsured motorist coverage, or more particularly uninsured motorist coverage for personally owned vehicles. Instead, the certificates represent to third parties that the company has liability coverage in case the company causes damages to others. The entities that would be relying upon the certificates were Maine Link's clients, not Mr. Jones. Furthermore, Mr. Candage did not find fault with the certificates. He does not believe that Jim Chalmers misrepresented information or acted fraudulently. (D.S.M.F. ¶¶ 68, 74; O.S.M.F. ¶ 68.)

Mr. Jones has argued that the Chalmers negligently misrepresented Maine Link's coverage with the certificates of liability insurance, and also misled Mr. Jones by conveying to him that by adding Jessica to the Drive Other Car endorsement on Maine Link's policy, which Mr. Jones was also listed on, that Jessica would be covered for anything she drove, including driving for personal reasons. Mr. Jones alleges that he relied on these representations when he decided not to purchase $1 million worth of personal coverage for his motorcycle. With respect to the contention regarding Jessica, Mr. Jones has provided no information in the record that supports the statement that he was informed that Jessica would be covered for anything she drove. Regarding the certificates of liability insurance, Mr. Jones has not demonstrated to the court that the certificates contained false representations. The certificates discussed liability coverage, not underinsured motorist coverage. The certificates were also meant to guide Maine Link's clients, not Mr. Jones.

As the Plaintiff has not established a *prima facie* case of negligent misrepresentation, the court grants summary judgment to the Defendant on Count III.

---

coverage were sent to third parties, those assertions were not properly supported in the summary judgment record. (A.S.M.F. ¶¶ 90-91; R.S.M.F. ¶¶ 90-91.)

### c. Breach of Contract

Failure to procure insurance claims can proceed both under a contract theory and under a negligence theory. *County Forest Products, Inc. v. Green Mountain Agency, Inc.*, 2000 ME 161, ¶ 42, 785 A.2d 59 (holding that "it may be possible to construe the cause of action against Green Mountain [the surplus and excess lines insurance agency] as one sounding in contract in which the contract is one to procure insurance and the parties to the contract are Green Mountain and Peabody [the insurance agency] or County Forest [the insured].") The Law Court has held that "[t]he existence of a contract is a question of fact to be determined by the jury." *Bates v. Anderson*, 614 A.2d 551, 552 (Me. 1992).

Mr. Jones argues that there is a genuine issue of material fact over whether or not there was an agreement for Chalmers to provide $1 million in coverage for every vehicle Mr. Jones drove for work, which in his opinion, would include his motorcycle, and whether the failure to secure the coverage for the motorcycle was a breach of the agreement. While Mr. Jones has not provided any support for the statement that he requested $1 million in coverage for everything he drove for work, it is clear from the record that Jim Chalmers was aware that Mr. Jones required a policy with $1 million in coverage. Jim Chalmers knew that Mr. Jones drove his motorcycle to work. The question remains whether there was an agreement to insure everything Mr. Jones drove for work after Mr. Jones provided that he wanted to be "bulletproof" and have his license insured.

Therefore, the court finds that this claim should go to the fact-finder to determine whether or not there was a contract to procure insurance for Mr. Jones that would have covered his motorcycle, and whether that contract was breached.

### d. Equitable Estoppel

16

"To assert equitable estoppel in an insurance contract, an insured must prove two elements: 1) unreasonable conduct by the insurer which misleads the insured concerning the scope of coverage; and (2) justifiable reliance by the insured upon the conduct of the insurer." *County Forest Products, Inc.*, 2000 ME 161, ¶ 26, 758 A.2d 59. "Equitable estoppel requires misrepresentations, including misleading statements, conduct, or silence, that induce detrimental reliance." *Dep't of Human Servs. v. Bell*, 1998 ME 123, ¶ 8, 711 A.2d 1292.

The Law Court has warned "that the doctrine of equitable estoppel should be 'carefully and sparingly applied,' . . . ." *Town of Union v. Strong*, 681 A.2d 14, 19 (Me. 1996) (quoting *Vacuum Systems, Inc. v. Bridge Const. Co.*, 632 A.2d 442, 444 (Me.1993)).[10]

The Plaintiff has asserted that it wishes to use equitable estoppel as a means of preventing Chalmers from denying that Mr. Jones had asked for $1 million worth of coverage for everything he drove for work. Plaintiff asserts that Chalmers "made numerous misrepresentations about whether Mr. Jones had insurance coverage for 'any auto' that he drove, whether for business or personal purposes over the years." (Pl.'s Opp. 19.) However, Plaintiff provides no support from the record for this statement. If the Plaintiff is referring to the certificates of liability insurance, the plaintiff has not demonstrated to the court that those certificates were misrepresentations. If the Plaintiff is referring to statements made regarding coverage for Jessica Jones, the Plaintiff

---

[10] There is some confusion as to whether equitable estoppel can even be asserted as cause of action in Maine. In *Waterville Homes, Inc. v. Maine Dep't of Transp.*, the Law Court pronounced "plaintiffs' argument on appeal that their complaint sets forth the essential elements of estoppel fails to recognize the well settled principle that estoppel is available only for protection, and cannot be used as a weapon of assault." 589 A.2d 455, 457 (Me. 1991)(quotation omitted). *See also Weaver v. New England Mut. Life Ins. Co.*, 52 F. Supp. 2d 127, 134 (D. Me. 1999) ("equitable estoppel is a defense, not a cause of action.") The Plaintiff, however, cited to a number of Maine Cases where equitable estoppel was considered as a claim. *See F.S. Plummer Co. Inc. v. Town of Cape Elizabeth*, 612 A.2d 856 (Me. 1992); *Berry v. Bd. of Trustees, Maine State Ret. Sys.*, 663 A.2d 14, (Me. 1995); *Salisbury v. Town of Bar Harbor*, 2002 ME 13, 788 A.2d 598. Citing *Waterville Homes, Inc.* as well as *Martin v. Prudential Ins. Co.*, 389 A.2d 28, 30–32 (Me.1978) (where the court considered an equitable estoppel claim), the First Circuit stated that regarding equitable estoppel "Maine case law is unclear." *Grande v. St. Paul Fire & Marine Ins. Co.*, 436 F.3d 277, 279 n. 1 (1st Cir. 2006).

17

never provided anything in the summary judgment record that shows what Chalmers stated regarding Jessica Jones' coverage. The Plaintiff also points to Chalmers' knowledge that Mr. Jones was driving his motorcycle to work and Chalmers' silence regarding his coverage. Bearing in mind that the Plaintiff never added his motorcycle to the policy, and that Plaintiff has presented nothing to suggest that he discussed motorcycle coverage with Chalmers, the Plaintiff has failed to show that Mr. Jones' silence was unreasonable and misleading. The Plaintiff has not made a *prima facie* case on its claim for equitable estoppel. Summary judgment is granted to the Defendant on Count V.

### e. Promissory Estoppel

"Promissory estoppel is a contract doctrine invoked to enforce promises which are otherwise unenforceable so as to avoid injustice." *Cottle Enterprises, Inc. v. Town of Farmington*, 1997 ME 78, ¶ 17 n. 6, 693 A.2d 330, 336. Maine has accepted the doctrine of promissory estoppel and has adopted the definition of promissory estoppel contained in the Restatement (Second) of Contracts:

> 'A promise which the promisor should reasonably expect to induce action or forbearance on the part of the promisee or a third person and which does induce such action or forbearance is binding if injustice can be avoided only by enforcement of the promise. The remedy granted for breach may be limited as justice requires.'

*Harvey v. Dow*, 2008 ME 192, ¶ 11, 962 A.2d 322, (quoting Restatement (Second) of Contracts § 90(1) (1981)).

In its memorandum, the Plaintiff represents that "Chalmers made promises to Mr. Jones that it would take care of him and that Mr. Jones could count on Chalmers to cover him." (Def.'s Opp. 18.) There is nothing in the summary judgment record that supports this claim. The Plaintiff has also failed to demonstrate that the Defendant promised to provide $1 million in

18

coverage that would include Mr. Jones's motorcycle. Therefore the court is granting summary judgment to the Defendant on the promissory estoppel claim.

Accordingly, the court **ORDERS** that Defendant's Motion for Summary Judgment is GRANTED as to counts III, V, and VI of Plaintiff's Amended Complaint, and the Motion is DENIED as to counts I, II, and IV.

The clerk is directed to incorporate this Order into the docket by reference pursuant to Maine Rule of Civil Procedure 79(a).

Dated: June 30, 2014

Hon. Roland A. Cole
Justice, Superior Court

Wendell Large Esq
PO BOX 9545
Portland ME 04112

— Defendent

— Plaintiff

Terrence Garmey Esq
482 Congress Street Suite 402
PortlandME 04101