1997 ME 78

COTTLE ENTERPRISES, INC., d/b/a
Cascade Leisure Park, et al.

v.

TOWN OF FARMINGTON, et al.

Supreme Judicial Court of Maine.

Argued Nov. 5, 1997.

Decided April 16, 1997.

John E. Nale (orally), Waterville, Stuart W. Tisdale, Jr., Portland, for plaintiff.

Joseph J. Hahn (orally), Lee K. Bragg, Bernstein, Shur, Sawyer & Nelson, Portland, for defendant.

Before WATHEN, C.J., and ROBERTS, GLASSMAN, CLIFFORD, RUDMAN, DANA and LIPEZ, JJ.

LIPEZ, Justice.

[¶ 1] This appeal arises from the enactment of a sewer moratorium, the events leading to that enactment, and their alleged impact on the development of a mobile home park. Cottle Enterprises, Inc., d/b/a Cascade Leisure Park, et al. (Cottle)[1] appeals from the judgment entered in the Superior Court (Franklin County) pursuant to summary judgments in favor of the Town of Farmington, et al. (the Town) on Cottle's claims of an unconstitutional taking of property (Alexander, J.), and tortious misrepresentation and denial of equal protection (Crowley, J.), and the court's dismissal of Cottle's promissory estoppel claim (Delahanty, J.). Cottle claims numerous errors in these rulings. We find none and affirm the judgment.

1. We refer to the parties collectively as "Cottle." However, due to John Cottle's personal partic-

*Background*

[¶ 2] In 1987 Cottle decided to build a mobile home park in Farmington for the elderly. It made sizeable down payments on the approximately 155 acres where the leisure park was to be located. The purchase was contingent on state and local approvals.

[¶ 3] In February 1988 Cottle filed an application for subdivision approval with the Town Planning Board. The subdivision regulations stipulate that an applicant must demonstrate that the proposed subdivision will not have an "unreasonably adverse impact on municipal services," including the "sewage treatment plant." Cottle's application included a letter from Farmington Sewer Superintendent Steve Moore (Moore), asserting that the sewage system "should have enough capacity to handle the proposed 30 to 150 units of adult housing." This letter was not a permit for the sewer hook-ups. According to the Town's sewer ordinance, such permits may be obtained only by applying to the Sewer Commission, comprised of the Board of Selectmen.

[¶ 4] In March, the Planning Board approved Cottle's project unanimously, subject to the Maine Department of Environmental Protection's (DEP) approval. Cottle completed purchase of the park property at the end of that month. Moore visited the property at that time and told Cottle once more that there would be no problem with the sewer hook-ups. Moore confirmed his opinion in May when he signed a letter provided by one of Cottle's engineers, who was attempting to respond to the DEP's request for verification that the projected gallons per day of sewer use "will have no adverse impact" on the sewer system. This letter was a statement of the system's then foreseeable capacity. The DEP approved Cottle's application in the spring of 1989, noting in its administrative order that "[t]he proposed project will generate an estimated 33,750 gallons of waste water [sic] a day.... In a letter ... Steven A. Moore, Superintendent of the Farmington Wastewater Treatment Plant, indicates that the additional wastewater generated by the proposed subdivision

ipation in many of the proceedings described, we refer to John Cottle personally in some contexts.

will not have an adverse impact on the [plant]."

[¶ 5] Meanwhile, the Town had begun to discover problems with its treatment and disposal of wastewater. By November 1989 both the state and federal governments were taking action against the Town because of problems with discharge measuring procedures and compliance. The Town claims it was unaware of any problems at the sewer plant until early that month, when an engineering firm gave it a report citing capacity problems at the plant and the DEP's inspector wrote a letter to Moore citing deficiencies in the plant's operations and performance. Moore admitted to the inspector that he had not been conducting the water-sampling properly.

[¶ 6] After conducting follow-up inspections, the DEP wrote Moore that the Town's plant had not been in compliance with licensing requirements "for a long time," that the waste flow probably had not been measured accurately for years, and that the inspector himself had witnessed solid sewage being carried into the river from the plant several times. In January 1990 the DEP determined that the Town's wastewater discharge was unacceptably above the license limits and that Moore's failure to report violations had compromised its honor system. The DEP reissued a discharge license to the Town conditioned on suspension of its permission to receive sewage. Town Manager John Edgerly (Edgerly) informed all interested parties, including Cottle, that the Town would issue no new sewer hook-up permits for at least 60 days beginning that March 20. In May, Edgerly informed the DEP inspector of the Town's efforts toward compliance, including the drafting of a sewer moratorium. He noted such a moratorium would create difficulties for those who were in the process of developing properties whose operation would be contingent on sewer hook-ups.

[¶ 7] The moratorium was enacted at a special Town meeting in May as an amendment to the existing sewer ordinance. It provided that

[o]nly twenty residential permits may be issued in one calendar year. No person, firm, corporation or legal entity, inclusive of financial and legal affiliates, may be entitled to more than 2 permits in one calendar year.... After making a determination regarding the Town's current ability to comply with the Town's discharge license, the Commission may increase or decrease the total number of residential permits issued in any calendar year.

The moratorium stipulated further that when

an applicant for a residential unit permit fails to obtain a permit within a reasonable time, the applicant may proceed with the installation of subsurface waste disposal system or sewage storage system in accordance with State law and regulations. Once this article has expired and the Town has given official hookup notice ..., the residential units with subsurface sewage disposal systems must connect to the sewer line within three years; the residential units with sewage storage systems shall connect within ninety (90) days.... The connection fee shall be waived for all residential units developed under the requirements of this article.

The moratorium also included the following "grandfather" clause: "This Article shall apply to development for which substantial site improvements have not been made by the date of adoption of this Article." The Town claims that Cottle's leisure park development, which had completed Phase I of construction (including water and sewer system installations) by May 1990, was protected by this clause. Cottle asserts that Phase I of the project was not completed until August 1990, with "seventy-five sites ... completed, with 31 ready to go with water and sewer." [2] In June the Town received an administrative order from the federal Environmental Pro-

---

**2.** John Cottle claims in an affidavit that his efforts to investigate the alternative of installing septic tanks were frustrated because the property's soil conditions would not support such a use. According to a bank official, however, Cottle never made an attempt to investigate such alternatives further, in part because, as John Cottle stated, the project had been "approved the way it was approved. The town did what they did, and he wasn't going to spend any more money in putting in septic systems per lot."

tection Agency requiring the DEP's approval of any new additions to the sewer collection system.

[¶ 8] Although John Cottle did not attend the meetings at which the Town deliberated and voted on the sewer moratorium, he appeared at a Board of Selectmen meeting in September 1990 to express concern about the moratorium's effect on his project. According to the minutes,

> John Cottle was present to discuss his sewer situation. He has an approved subdivision and he was under the impression that he could hook into the sewer because of this preapproved subdivision. John has invested a lot of money into this development and now he cannot hook any of the homes into the sewer. John and his bank have invested a large sum of money for this investment that is absolutely worthless at the present time because of the sewer situation. John does not feel that the 2 hook ups per year are feasible for a subdivision like his. He has financial obligations that cannot be met because of the sewer limits.

At the meeting, however, Cottle did not apply to the Selectmen in their role as the Board of Sewer Commissioners for hook-ups pursuant to the moratorium clause. John Cottle also attended a public hearing in Farmington in January 1991 to protest having been allowed only two sewer permits. There is no evidence that Cottle ever made an application at any time to the Town for sewer hook-up permits as required by the sewer ordinance, or for a subsurface septic system or for any other waste storage facility as permitted by the terms of the moratorium, or to the DEP for an exception to the sewer permit limitations it was then enforcing.

[¶ 9] By July 1990 officials of Peoples Heritage Bank (Peoples Heritage or the bank) were negotiating on Cottle's behalf with the DEP in an attempt to keep the park project alive. Cottle was now in default on the notes and mortgages held by the bank. That November, to facilitate Cottle's sale of the leisure park property, Edgerly approached the DEP for an exception from the two hook-up restriction. The DEP granted the Town permission, subject to certain con-

ditions, to allow 25 new hook-ups per year. The new hook-ups were given "only . . . to enable sale of the whole property and [do] not necessarily extend to the present owner [Cottle] in case the whole property is not sold." In February 1991 this information was transmitted by the Town to Cottle, and in May the bank agreed to discharge Cottle's indebtedness in exchange for a deed to the property. The property and project were purchased in September by Cascade Landholdings, Inc. from the Peoples Heritage assignee for $500,000.

[¶ 10] In November 1991 Cottle filed a three-count complaint alleging a confiscatory taking, violations of equal protection and due process, and violation of unnamed constitutional rights pursuant to 42 U.S.C. § 1983. Cottle amended the complaint in January 1993 to add an additional count of violation of equal protection and due process and one count of "breach of commitment" to provide 155 sewer hook-ups. In a second amended complaint, dated March 1993, Cottle alleged confiscatory taking, two counts of violation of equal protection and due process, violation of 42 U.S.C. § 1983, breach of commitment, misrepresentation, and promissory estoppel. In September 1993 the court entered a summary judgment in the Town's favor on several counts of the original complaint, including the claim of unconstitutional taking. In July 1994 it entered a summary judgment in the Town's favor on the equal protection and tortious misrepresentation claims, but denied it as to the promissory estoppel claim. The Town moved to dismiss the promissory estoppel claim in late 1994, and the court dismissed it in January 1996. Cottle appeals from the summary judgments and the dismissal.

### Standard of Review

[¶ 11] In reviewing an appeal from a summary judgment we assess the evidence in the light most favorable to the party against whom judgment was entered and review the court's decision for errors of law. *Gonzales v. Commissioner, Dep't of Public Safety,* 665 A.2d 681, 682 (Me.1995). When there is no genuine issue of material fact and the moving party is entitled to a

judgment as a matter of law, we must affirm. *Id.* at 682–83. At the summary judgment stage of the proceeding, the task of the court is not to decide any disputed factual questions, but to determine whether the record before the court generates a genuine issue of material fact. *Casco N. Bank, N.A. v. Edwards*, 640 A.2d 213, 215 (Me.1994). The court cannot decide an issue of fact even if the opposing party's chances of prevailing at trial on that issue are improbable. *Tallwood Land & Dev. Co. v. Botka*, 352 A.2d 753, 755 (Me.1976) (citing Field, McKusick & Wroth, 2 *Maine Civil Practice* § 56.4 at 39 (2d ed. 1970)).

### Unconstitutional Taking of Property

 [¶ 12] Cottle claims that the sewer moratorium's limitation to two sewer hookups per year was an unconstitutional taking of its property. Under Maine's "home rule" statute, a temporary moratorium to restrict access to a public sewer system is an exercise of the Town's police power, 30–A M.R.S.A. § 3001 (Supp.1995); see *Tisei v. Town of Ogunquit*, 491 A.2d 564, 569–71 (Me.1985). Government regulation that exacts costs from private business does not work an impermissible regulatory taking as long as it is a reasonable use of the police power. *Maine Beer & Wine Wholesalers Ass'n v. State*, 619 A.2d 94, 99 (Me.1993). Other courts have held specifically that developers have no common law rights to available sewer capacity, *Cumberland Village Hous. Assoc. v. Town of Cumberland*, 609 F.Supp. 1481, 1484 n. 1 (D.Me.1985) (town may deny applications to reserve capacity for future use (citing *Tisei*, 491 A.2d 564), and that sewer moratoria constitute attempts to prevent public harms rather than creations of public benefit for which property owners' attendant losses must be compensated). *Smoke Rise, Inc. v. Washington Suburban Sanitary Comm'n*, 400 F.Supp. 1369, 1382 (D.Md.1975).

[¶ 13] In addition, Cottle's position is compromised by its failure to apply for any sewer permits or for a decision from the Town regarding application of the moratorium to the development. *Waltman v. Town of Yarmouth*, 592 A.2d 1079, 1079 n. 2 (Me. 1991). Simply put, the takings claim presented no issue for determination. *MacDonald, Sommer & Frates v. County of Yolo*, 477 U.S. 340, 348–51, 106 S.Ct. 2561, 2565–67, 91 L.Ed.2d 285 (1986) (a final and authoritative determination of the development legally permitted is an essential prerequisite to assertion of a regulatory takings claim); *Agins v. Tiburon*, 447 U.S. 255, 260, 100 S.Ct. 2138, 2141, 65 L.Ed.2d 106 (1980) (no concrete controversy regarding application of ordinance until an application is submitted and decided upon).

### Tortious Misrepresentation

 [¶ 14] Cottle alleges that it relied to its detriment on false representations of material fact by Moore as to the Town's wastewater treatment capacity. Cottle contends that the court erred by ruling that the Town's insurance does not cover such a cause of action, and therefore it never waived its immunity pursuant to 14 M.R.S.A. § 8116 (Supp.1996).[3] We do not reach that insurance issue because we affirm on grounds different than those relied on by the court. As the Town argues, Cottle's misrepresentation claim should have been resolved on the basis of its failure to satisfy the notice of claim requirement of the Maine Tort Claims Act.

[¶ 15] The misrepresentations at issue were made by Moore no later than early 1989. Cottle did not serve a notice of claim on the Town until May 1993. The Act requires the filing of a notice of claim within 180 days of the wrongful act alleged to produce a judicially cognizable injury.[4] 14 M.R.S.A. § 8107(1) (1980 & Supp.1995); *Smith v. School Admin. Dist. No. 58*, 582 A.2d 247, 249 (Me.1990); *McNicholas v. Bickford*, 612 A.2d 866, 869 (Me.1992). Giv-

3. The statute states in pertinent part:
 ... If the insurance provides coverage in areas where the governmental entity is immune, the governmental entity *shall be liable* in those substantive areas but only to the limits of the insurance coverage....

4. Without suggesting that a complaint in a civil action can serve as a notice of claim under the Act, we note that such an argument would avail nothing here. Cottle filed its first complaint in November 1991, well beyond the 180-day time frame of the Act.

en the facts of this case, neither the "substantial compliance" provision, 14 M.R.S.A. § 8107(4); see *Erickson v. State*, 444 A.2d 345, 349–50 (Me.1982) (substantial compliance exception applicable only when 180–day requirement is satisfied), nor the exceptions for "good cause" apply. 14 M.R.S.A. § 8107(1), (5); see *Smith*, 582 A.2d at 249–50 (good cause due to physical inability to file a claim); *Smith v. Voisine*, 650 A.2d 1350, 1352 n. 4 (Me.1994) (noting statutory expansion of definition of good cause to include belief that governmental entity or its liability insurer would cover a claim); *McNicholas*, 612 A.2d at 869 (good cause due to plaintiff's having been prevented from learning information forming basis of complaint).[5]

### *Denial of Equal Protection*

[¶ 16] Cottle claims that the Town denied it equal protection of the law because the Town arranged an exception of 25 sewer hook-ups per year to the sewer moratorium for the subsequent owner of his leisure park property, Peoples Heritage, after allegedly refusing to exempt it from the moratorium's two sewer hook-up per year limitation. This claim fails for several reasons. First, the Town never denied Cottle anything because it did not apply to the Town for the necessary sewer hook-up permits. Second, even if Cottle had been denied permits, it would have suffered that deprivation because of acts of the DEP rather than those of the Town. Only the DEP had the authority to approve the exceptional sewer hook-ups, and only the DEP did so. Finally, Cottle does

not allege, much less demonstrate, that the purported disparate treatment was intentional. *E & T Realty v. Strickland*, 830 F.2d 1107, 1112–13 (11th Cir.1987) (claim of unequal application of a facially neutral statute requires proof of intentional discrimination).

### *Promissory Estoppel*

[¶ 17] Cottle challenges the court's dismissal of its promissory estoppel claim, which it characterizes anew on appeal as a claim of "equitable estoppel." Although the court styled its order as a ruling on a motion to dismiss, it treated the motion as one for a summary judgment because it looked beyond the complaint in determining that Cottle's reliance was unreasonable due to Moore's lack of authority to make binding representations or issue sewer permits for the Town. See M.R.Civ.P. 12(b) ("If, on a motion . . . to dismiss for failure of the pleading to state a claim upon which relief can be granted, matters outside the pleading are presented to and not excluded by the court, the motion shall be treated as one for summary judgment and disposed of as provided in Rule 56, and all parties shall be given reasonable opportunity to present all material made pertinent to such a motion by Rule 56."). The parties had a reasonable opportunity to present pertinent material when the court considered the previous motion for a summary judgment on the promissory estoppel claim. The court was correct about the limits of Moore's authority, and the deficiencies of the estoppel claim, whether couched in equitable or promissory terms.[6] See *Shack-*

---

5. Cottle claims it did not realize that Moore had misrepresented the extent of the Town's sewer capacity to it in February and May 1988 until consulting its attorney in December 1992, after the attorney had made inquiries at the DEP. As Cottle admits, however, the Town manager notified all interested parties, including Cottle, that there would be no new sewer hook-ups for 60 days as of March 1990 because of severe problems with sewer capacity. Furthermore, even if Cottle were temporarily unaware of the voters' adoption of the sewer moratorium at the town meeting in May 1990, it appeared at a Board of Selectmen meeting in September 1990 to complain about the impact on its leisure park development. By then Cottle must have understood that Moore's representations had been, at the very least, inaccurate.

6. Cottle's brief on appeal argues equitable estoppel, but the relevant count of its complaint alleges promissory estoppel. Given this confusion, we must clarify the difference between the two theories. Promissory estoppel is a contract doctrine invoked to enforce promises which are otherwise unenforceable so as to avoid injustice. *Chapman v. Bomann*, 381 A.2d 1123, 1127 (Me. 1978) (adopting Restatement (Second) of Contracts (Restatement) § 90 (1981)). Thus, a claim of promissory estoppel requires demonstration of "[a] promise which the promisor should reasonably expect to induce action or forbearance on the part of the promisee or a third person. . . ." Restatement § 90. Equitable estoppel, sometimes referred to in our cases as "estoppel in pais," 381 A.2d at 1128, does not involve promises. Instead, it involves misrepresentations, including misleading state-

*ford & Gooch, Inc. v. Town of Kennebunk,* 486 A.2d 102, 106 (Me.1984) (unauthorized act of a municipal officer cannot be grounds for equitably estopping the municipality); *Sirois v. Town of Frenchville,* 441 A.2d 291, 294–95 (Me.1982) (same with respect to promissory estoppel). Thus, we affirm the court's entry of a judgment for the Town. *Gonzales,* 665 A.2d at 682–83 (this Court must affirm a summary judgment when there is no issue of material fact).

Therefore, the entry is:

Judgment affirmed.

ments, conduct, or silence, that induce detrimental reliance. *Littlefield v. Adler,* 676 A.2d 940, 942 (Me.1996); *see also Pino v. Maplewood Packing Co.,* 375 A.2d 534, 539 (Me.1977) (citing *Colby v. Norton,* 19 Me. 412, 418 (1841) (misrepresentations need not be intentional)). As Cottle seems to have understood belatedly, the facts of this case suggest a misrepresentation theory rather than an estoppel claim based on a promise.