STATE OF MAINE
SAGADAHOC, ss.

SUPERIOR COURT
LOCATION: BATH
DOCKET NO.: BATSC-CV-17-24

JESSICA MAGUE )
)
Plaintiff, )
)
v. )
)
STANWOOD CURTIS FISH, JR., )
SHARON DRAKE, )
SHARON DRAKE REAL ESTATE, INC., )
and )
LONGREACH CORPORATION, )
)
Defendants. )

**ORDER ON DEFENDANTS'
MOTION FOR SUMMARY
JUDGMENT**

This matter is before the court on the Defendants' Motion for Summary Judgment. The court heard oral argument on March 5, 2019.

## BACKGROUND

This case centers around the end of a romantic relationship. The following facts are undisputed unless otherwise noted. The Plaintiff ("Mague" or "Plaintiff") and Defendant Stanwood Curtis Fish, Jr. ("Fish") met and began a relationship in 2006. (Plaintiff's Additional Statement of Material Facts ("PASMF") ¶ 1.) When the parties met, Mague was in the process of building a home on a parcel of land she owned. (PASMF ¶ 2.) Sometime in the following year or so, at Fish's suggestion, Mague abandoned the construction of her home and joined forces with Fish to build one home on his property. (PASMF ¶¶ 3-4.) From the beginning of the relationship through the end, Mague understood that Fish did not want to be married, but was uneasy about this because of the position of financial vulnerability it placed her in. (*passim* PASMF and Defendants' Statement of Material Facts ("SMF")). Fish repeatedly assured her that they were in a

1

lifetime committed relationship, and whenever Mague spoke of marriage Fish reiterated that he did not want to be married and asked Mague to "trust him." (SMF ¶¶13-14, 20.)

Throughout the construction of the home and a barn, the parties agreed that Fish would pay for nearly all of the costs, while Mague would contribute through architectural design and physical labor. (PASMF ¶¶ 11-14; SMF ¶ 1.) In addition to financing the construction, Fish also put significant time and labor into the construction. (PASMF ¶ 14.) Mague contributed some items to the construction of the home, including a window and door with sentimental value. (Pl.'s qualification of SMF ¶ 35.) Mague's mother gifted elm wood to both Mague and Fish that was used to build a staircase, banisters, and vanities in the home. (SMF ¶ 35.) Mague contributed money towards the foundation of the barn. (PASMF ¶ 13.) While living together, Fish paid the mortgage, real estate taxes, homeowners insurance, and utilities which amounted to roughly $3,800 per month. (SMF ¶¶ 40-44.)[1] Mague contributed about $1,333 per month towards household expenses. (SMF ¶ 39.) She also took on household chores and duties. (SMF ¶¶ 19-20.)

During the course of their relationship, on multiple occasions, Fish promised to provide for Mague into her old age, that the home they built would be theirs for the rest of their lives, and that he would provide for her domestically and professionally for the rest of her life. (SMF ¶¶ 1, 3, 26, 27, 29, 30.) While in a relationship with Fish, Mague worked for Longreach Corporation ("Longreach"), Fish's company. (SMF ¶ 47.) Fish's

---

[1] Mague denies these facts, but her denial is unsubstantiated. She states that "she is without sufficient knowledge to admit or deny" the facts other than what is provided in Fish's affidavit. She does not allege any untruthfulness in his affidavit or provide any record cite that shows contradictory information. *See* M.R. Civ. P. 56(h)(4). Further, she does not deny that he paid these expenses. Because of this, these facts are deemed admitted. *See Vinick v. Commissioner of Internal Revenue*, 110 F.3d 168, 171 (1st Cir. 1997) ("Neither party may rely on conclusory allegations or unsubstantiated denials, but must identify specific facts derived from the pleadings, depositions, answers to interrogatories, admissions and affidavits to demonstrate either the existence or absence of an issue of fact.").

mother, Defendant Sharon Drake ("Drake"), owns Sharon Drake Real Estate, Inc. ("SDRE"), that Mague also worked for. (SMF ¶ 47.) Mague admits she was paid for her work with both companies, but claims she was underpaid. (SMF ¶¶ 48-53.)

A number of times throughout the relationship, Mague suggested combining assets, putting her name on the deed to the home, and making her an owner in one of the businesses, but Fish was not in favor of those actions and instead asked Mague to trust him. (SMF ¶ 14.) Fish ended the relationship in 2016, required Mague to leave the home, and fired her from Longreach a few months later. (SMF ¶ 31, PASMF ¶ 34.)

This case suffers a torturous procedural history. The following is a brief summary to set the stage for the Motion before the court. Mague initially brought suit against eight defendants: Fish, Drake, and six of their companies that they each owned. Defendants moved to dismiss some of Plaintiff's claims and the Complaint against certain defendants, which was granted. The remaining Defendants are Fish, Drake, Longreach, and SDRE. Mague moved to amend her Complaint to add new claims which was partially granted. She agreed at various times to the dismissal of some counts of her Complaint. The following are the remaining counts to be resolved on this Motion for Summary Judgment, including the particular Defendants that the counts are asserted against.

- Promissory Estoppel – Count I
  o Defendant Fish
- Fraudulent Misrepresentation – Count IV
  o Defendant Fish
- Unjust Enrichment – Count V
  o All Defendants
- Negligence – Count VII
  o Defendant Fish and Defendant Drake
- Conversion – Count VIII
  o All Defendants
- Civil Conspiracy – Count XII
  o All Defendants

## DISCUSSION

Summary judgment is appropriate if, reviewing the evidence in the statements of fact and record references in the light most favorable to the non-moving party, there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. M.R. Civ. P. 56(a), (c); *Platz Assocs. v. Finley*, 2009 ME 55, ¶ 10, 973 A.2d 743 (internal citations omitted). A fact is material if "it has the potential to affect the outcome of the suit." *Id.* "A genuine issue of material fact exists when the fact finder must choose between competing versions of the truth." *Id.* To survive a summary judgment motion, a plaintiff must show a prima facie case for each element of her cause of action. *Estate of Barron v. Shapiro & Morley, LLC*, 2017 ME 51, ¶ 13, 157 A.3d 769. "If a plaintiff presents insufficient evidence on an essential element of a cause of action, such that the defendant would be entitled to judgment as a matter of law on that state of the evidence at a trial, the defendant is entitled to a summary judgment." *Id.*

### Promissory Estoppel – Count I

Plaintiff's promissory estoppel claim is asserted against Defendant Fish only. Mague is seeking damages in the form of a payment representing part of the home's equity and unpaid wages. She alleges that based on Fish's promises to her, she believed she would have a home to live in for the remainder of her life. Additionally, she maintains that she agreed to work for a lower salary as her contribution to the home, and she relied on Fish's promises that he would take care of her domestically and financially into her old age. Fish argues that it was unreasonable for Mague to rely on his promises because he refused to marry her from the outset or make any other binding legal commitment to her. He relies on her deposition testimony to support his argument. Additionally, he contends that as an at-will employee, Mague may not pursue a promissory estoppel claim for unpaid wages.

4

## A. Promissory Estoppel, the Equity in the Home, and Related Claims

"Promissory estoppel is a contract doctrine invoked to enforce promises which are otherwise unenforceable so as to avoid injustice." *Cottle Enters. v. Town of Farmington*, 1997 ME 78, ¶ 17 n.6, 693 A.2d 330. Maine has adopted the Restatement (Second) of Contracts' formulation of promissory estoppel. *Chapman v. Bomann*, 381 A.2d 1123, 1127 (Me. 1978). Therefore, a plaintiff has a claim if she can show

> [a] promise which the <u>promisor</u> should reasonably expect to induce action or forbearance on the part of the promisee . . . and which does induce such action or forbearance is binding if injustice can be avoided only by enforcement of the promise. The remedy granted for breach may be limited as justice requires.

*Id.* (emphasis added). The relied upon promise does not need to be express and may be implied from the promisor's conduct. *June Roberts Agency v. Venture Props.*, 676 A.2d 46, 50 (Me. 1996).

In the case at bar, despite the standard referencing a "promise which the promisor should reasonably expect to induce action or forbearance on the part of the promisee," Fish focuses on why it was unreasonable for Mague, the promisee, to rely on his promises to stay in a committed relationship and that she would have a place to live forever.[2] He points to the fact that he refused to place her name on the deed to the home and that she never became an owner in any of his businesses as to why her beliefs were unreasonable. Fish, however, does not deny making express promises to provide for Mague, or that he

---

[2] Plaintiff cites to caselaw which describes enforcement of a promise if the promisee's conduct is "foreseeable and reasonable and involves a definite and substantial change of position which would not have occurred if the promise had not been made." *Harvey v. Dow*, 2008 ME 192, ¶ 19, 962 A.2d 322 (citing Restatement (Second) of Contracts § 90 cmt. f.). This is the wrong standard to apply because *Harvey* is speaking specifically about a promise to make a gift. That is not an issue in the present case.

asked her to remain in a committed long-term partnership. Instead, he now states that it was unreasonable for her to rely on those promises.

The court found little caselaw on "reasonableness" in the context of a summary judgment motion on a promissory estoppel claim. Based on the Material Facts provided by both parties, a factfinder could determine that Fish, the promisor, should have reasonably expected Mague to rely on his promises that he would buy her a car and provide her with a home to live in for the remainder of her life given the amount of time and energy she put into constructing it, and that she allegedly took a smaller salary to contribute to it. She stopped building her own house in order to help Fish with his, and presumably could have earned more money elsewhere if not working for his company and taking a smaller salary in order to be able to contribute more to the home. It is up to a jury, not the court, to decide what is reasonable in this case and whether it would be an injustice for Fish to not compensate Mague whatsoever for her contributions towards the home.[3] Defendant Fish is denied Summary Judgment on Mague's promissory estoppel claim regarding Mague's claims against the home's equity in Count I.

## B. Promissory Estoppel and Mague's Claims of Unpaid Wages

Turning to unpaid wages, Fish argues that Mague, as an at-will employee, may not maintain a promissory estoppel claim to recover underpaid wages pursuant to Maine law. The Plaintiff maintains that the extra money she earned but was not paid was to go into the home, and towards the "long-term goal [] to mutually retire and have the

---

[3] Fish argues that this action is a disguised claim for palimony, which Maine does not recognize. Mague, however, is not seeking continued support or maintenance, but instead compensation for the economic value she put into Fish's property which she did not intend as a gift to him. Although the Law Court has said that "unmarried cohabitants have no legal obligation" to support each other, *Charette v. Charette*, 2013 ME 4, ¶ 10, 60 A.3d 1264, an unmarried cohabitant is not barred from bringing a tort action against the other to recover money put into property, *see Thibeault v. Brackett*, 2007 ME 154, ¶ 1, 938 A.2d 27.

6

business be their nest egg as to accomplish this goal, as well as to also take care of home related bills and expenses in the immediate term." The court finds merit in Fish's argument.

Neither party refers to the existence of an employment contract for a specific amount of time. Because of this, Mague was likely an at-will employee. *See Burnell v. Town of Kingfield*, 686 A.2d 1072, 1073 (Me. 1996) ("It is well settled that a contract of employment for an indefinite length of time is terminable at will by either party. In contrast, a contract that provides for a definite term of employment generally continues until the expiration of the term.") Fish cites to *Knowlton v. Shaw*, where the United States District Court was faced with a promissory estoppel claim in which the plaintiff alleged that his employer promised him he would be able to keep his job until he retired. 791 F. Supp. 2d 220, 224 (D. Me. 2011). The defendant employer put up a statute of frauds defense and argued that promissory estoppel was not available to at-will employees. *Id.* at 257. Because there was no precedent on point that stated at-will employees were not allowed to maintain to a promissory estoppel claim against their employer, the court undertook an analysis of existing Maine law.

The court cited to a brief decision of the Superior Court (York County, *Fritzsche, J.*) which explained that

> a claim for promissory estoppel, in the context of [an] employment dispute, is not compatible with Maine law. If an employee, absent contractual provisions to the contrary, can be fired for non-discriminatory reasons at any time without just cause then it would be pointless to adopt the doctrine of promissory estoppel forcing the person to be hired only to be let go immediately thereafter.

*Lockrow v. Biddeford-Saco Country Club*, No. CV-01-230, 2002 Me. Super. LEXIS 116, at *1 (May 30, 2002) (internal citation omitted). Relying on this and other Maine and federal caselaw to interpret Maine's likely position on the issue, the District of Maine concluded

7

that "[t]hese cases are consistent with the proposition that in Maine, an at-will employee may not maintain a promissory estoppel claim." *Id.* at 258. This court agrees with that conclusion. Because Mague does not allege she was an employee who could be terminated for cause only, she was an at-will employee. Defendant Fish is granted summary judgment on Mague's claim to recover unpaid wages on a theory of promissory estoppel under Count I. However, as discussed above, this does not preclude Mague from arguing at trial that she is entitled to some equity in the house based on her taking a lower salary in order to contribute to the home.

## Fraudulent Misrepresentation – Count IV

Plaintiff's fraudulent misrepresentation claim is asserted only against Fish. He argues that this claim must fail because Mague cannot show that her reliance on the promises Fish made was reasonable and because she cannot show the fraud element of the claim. In response, Mague argues that Fish acted recklessly because he did not exercise reasonable care in communicating his promises and information in them to her.

To sustain a claim for fraudulent misrepresentation, a plaintiff must prove its elements by clear and convincing evidence. *Me. Eye Care Assocs. P.A. v. Gorman*, 2006 ME 15, ¶ 16, 890 A.2d 707. "Evidence is clear and convincing if the factfinder could reasonably have been persuaded that the required findings were proved to be highly probable." *Id.* ¶ 19 (quotation marks omitted). A defendant is liable on a fraudulent misrepresentation claim when he

> (1) makes a false representation (2) of a material fact (3) with knowledge of its falsity or in reckless disregard of whether it is true or false (4) for the purpose of inducing another to act or to refrain from acting in reliance upon it, and (5) the plaintiff justifiably relies upon the representation as true and acts upon it to his damage.

*Letellier v. Small*, 400 A.2d 371, 376 (Me. 1979).

8

At issue in this case is whether, viewing the evidence in the light most favorable to Mague, Fish made his promises to her with knowledge of their falsity, or in reckless disregard of whether they were true or false.[4] Mague offers no evidence that Fish made these statements knowing they were false or with reckless disregard to their truth or falsity. Instead, she points out that he called her his "bride" and referred to her mother as his "mother in law." (PASMF ¶ 22.) Moreover, in 2010, the parties signed a domestic partnership agreement which specifically stated that they "were not in the relationship solely for the purpose of obtaining benefits coverage." (PASMF ¶ 24.) Further, the parties held themselves out to the world as a married couple. (PASMF ¶ 25.)

Mague putting forth evidence that Fish made promises to stay with her and support her forever, and then after ten years together breaking those promises, does not support even an inference that Fish knew the statements were false when he said them, or that they were made in reckless disregard to their truth or falsity. Instead, what she offers supports the opposite inference: that Fish believed he was in a lifetime relationship with Mague at the time he made the statements and promises. To accept Mague's reasoning would mean that it would be reckless for a person in a committed relationship to make a declaration of love and intent to provide for another person, and open up that person to liability for fraudulent misrepresentation in the event of a breakup. This court found no Maine caselaw addressing fraudulent misrepresentation in the context of an expired romantic relationship. This is likely because of the commonsense assertion that

---

[4] Mague cites caselaw for the proposition that a defendant can be held liable for pecuniary loss caused to plaintiffs based on their justifiable reliance on information that was communicated to them without reasonable care in obtaining or communicating it. This standard is for the tort of negligent misrepresentation, not fraudulent misrepresentation. *See Rand v. Bath Iron Works Corp.*, 2003 ME 122, ¶ 13, 832 A.2d 771 (addressing the standard for negligent misrepresentation). As such, that standard is inapplicable here and not considered by the court because Mague did not plead negligent misrepresentation.

Fish puts forth: "Courts should not be in the business of evaluating whether pledges of eternal love were made with a reckless disregard of whether they were true or false." Regardless, Mague fails to put forth any evidence, let alone disputed evidence, that Fish made the statements and promises to her with a reckless disregard of their truth or falsity or that he knew they were false when he made them. Defendant Fish is granted summary judgment on Count IV, fraudulent misrepresentation.

## Negligence – Count VII – Against Fish and Drake

Mague asserts her negligence claim against the Defendants Fish and Drake as her employers and in their individual capacities. The Defendants argue that she cannot maintain this claim against them as she alleges intentional, not negligent conduct. They next contend that her claim against them as employers fails because it is a "redundant tort" that should be addressed via the statutory scheme. Finally, Fish maintains he owed no duty to Mague as a domestic partner. In her opposition to summary judgment, Mague does not show how the Defendants' conduct was negligent instead of intentional, nor does she address the redundant tort issue. Instead, she relies on caselaw addressing the tort of negligent supervision and argues a disparity of position between her and the Defendants that created a special relationship and therefore she should be able to maintain a negligence action against the Defendants.

### A. Mague's Negligence Claim Against Fish and Drake as Employers

It is not clear to the court exactly what behavior Mague is alleging was negligent on behalf of Drake and Fish in their capacity as employers.[5] Briefly in her Complaint

---

[5] Mague asserts that "both Defendants owed Plaintiff the duty of care to not take advantage of her trust in them [w]hen she invested significant time, energy, and money, labor, resources, intellectual property, inter alia, into the home, and business, only to be kicked out of the relationship and lose all of her investments. Unfortunately, they breached that duty the moment

10

(¶¶ 45-46, 53), she alleges that Drake sexually harassed her while she worked at SDRE, that she brought up these concerns to both Drake and Fish, and that Fish was not receptive to her concerns. The Complaint alleges that Jessica was "at all times officially employed through Longreach Corporation . . . as well as working for SDRE through Longreach. . . " (¶ 53 n.3), and that the "alleged sexual harassment continued for most of the time that Jessica was employed by, or working with, Sharon Drake." The business structure of SDRE and its relationship to Longreach and Fish are not clear from the pleadings. Drake is listed as the "President, Owner, CEO and, or [sic] employee of Sharon Drake Real Estate, Inc.". (Compl. ¶ 3.) The same description is provided for Fish regarding SDRE. In a footnote to the Complaint, Mague explains that Longreach "provided business support and other employment related tasks and duties for [SDRE]."

Assuming that Mague has pled negligent conduct, this court addresses the Defendants' contention that she is asserting a "redundant tort" made superfluous by statutory remedial schemes as it is dispositive of her claim.[6] In *Paquin v. MBNA Marketing Systems* the plaintiff brought claims against her employer after receiving a right to sue letter from the Maine Human Rights Commission ("MHRC"). 195 F. Supp. 2d 209, 210 (D. Me. 2002). In her complaint, she alleged claims under the Maine Human Rights Act

that Defendant Fish Jr., ended the relationship and retained all of the Plaintiff's efforts for themselves." Pl.'s Opp'n 9.

[6] Even if it were not dispositive of her negligence claim, this court would still grant the Defendants summary judgment in their capacity as employers as Mague does not, and cannot based on existing caselaw, show that a "special relationship" existed between her and Drake, or her and Fish. Because of that, even if the court read her opposition liberally to assume that she was asserting a negligent supervision claim against either Defendant, it would fail. *See DeCambra v. Carson*, 2008 ME 127, ¶ 11, 953 A.2d 1163 (explaining that there is no general duty to protect another from the actions of a third party even if a person knows that third party is, or could be, dangerous but an exception to that rule is recognized if there is a "special relationship" between the plaintiff and the defendant, which, if proven, would allow an action against the defendant for negligent supervision under section 317 of the Restatement (Second) of Torts (1965).).

11

("MHRA"), 5 M.R.S. §§ 4551-4555, and common law claims of negligent supervision, negligent hiring, and negligent training on behalf of the employer. *Id.* MBNA moved to dismiss the plaintiff's common law claims based on the theory that they were "redundant torts" made superfluous by the MHRA and therefore preempted by it. *Id.*

The federal court recognized that Maine law was unsettled regarding this issue. It turned to *Bard v. Bath Iron Works Corporation,* where the Law Court held that a plaintiff could not assert both a common law wrongful discharge claim concurrently with a discrimination claim under the Whistleblowers' Protection Act. 590 A.2d 152, 156 (Me. 1991). In coming to that conclusion in *Bard,* the Law Court adopted the federal court's reasoning in an earlier case "that Maine law had already provided a remedy for the plaintiff's discrimination claim, and that the wrongful discharge claim was unnecessarily duplicative and threatened to undermine the statutory scheme." *Paquin,* 195 F. Supp. 2d at 210 (citing *Greene v. Union Mut. Life Ins. Co.,* 623 F. Supp. 295, 299 (D. Me. 1985)). In *Bard,* the Law Court explained that "where a statutory right and remedy are provided, there is no need to recognize a redundant tort." 590 A.2d 152, 156 (Me. 1991).

The *Paquin* court rejected the plaintiff's argument that her case was different than *Greene* and *Bard* because Maine law recognized her negligence claims whereas the wrongful discharge claim was not recognized in Maine law when the prior cases were decided. 195 F. Supp. 2d at 211. *Paquin* reasoned that either way, the common law claim was attempting to "remedy the violation of a right created by statute." *Id.* Therefore,

> allowing a concurrent common law claim to remedy the violation of a right protected by the MHRA would disrupt the delicate balance represented by the remedial scheme set forth in the statute. For example, the statutes have prescribed statutes of limitations, conciliation provisions and damages provisions which would be undermined by the allowance of a tort remedy. Like wrongful discharge, negligence remedies would inject uncertainty into a system crafted to define employer and employee duties and rights.

12

*Id.* (internal citation, quotation marks, and alterations omitted). The court concluded that Maine law would not permit the plaintiff to pursue her negligence claims and dismissed those counts. *Id.* Although the Law Court has not addressed *Paquin*, the Superior Court (York County, *O'Neil, J.*) has favorably cited to it as "holding [that] Maine law would not permit a plaintiff to pursue negligence claims in addition to sex discrimination claims." *Swett v. Sanford/Springvale Vfw Post 9935*, No. CV-15-243, 2016 Me. Super. LEXIS 71, at *6 (Apr. 26, 2016). It is also persuasive that in *Bard*, the Law Court accepted and relied on the reasoning of District of Maine in *Greene*.

The case before this court is slightly different as Mague did not file a complaint with the MHRC.[7] Regardless, if this court were to allow her negligence claim to go forward, it would "inject uncertainty into a system crafted to define employer and employee duties and rights." *Paquin*, 195 F. Supp. 2d at 211. Mague would effectively be avoiding the statute of limitations, procedural rules, and damages provisions set forth in the MHRA. Indeed, because she did not file a notice with the MHRC, she cannot purse her claims there. If her negligence claim were permitted to proceed, it would be a workaround of the MHRA. Because of this, the Defendants are granted summary judgment on Mague's negligence claims against them in their employer capacity.

**B. Mague's Negligence Claim Against Fish and Drake as Individuals**

"A duty is an obligation, to which the law will give recognition and effect, to conform to a particular manner of conduct toward another." *Budzko v. One City Ctr. Assocs.*, 2001 ME 37, ¶ 10, 767 A.2d 310. Whether a duty exists between two parties is a question of law for this court to decide. *See id.* "There does not exist a general obligation

---

[7] *See* Plaintiff's Motion to Dismiss Count X (Employment Discrimination/Unlawful Termination/Sexual Harassment) in which she states she did not provide the required notice to the MHRC, and the court's grant of that motion on March 29, 2018.

13

to protect others from harm not created by the actor." *Bryan R. v. Watchtower Bible & Tract Soc'y, Inc.*, 1999 ME 144, ¶ 12, 738 A.2d 839.

To the extent that Mague is seeking to hold either Fish or Drake liable in negligence for their mutual omission to protect her from the other, her claim must fail. She does not allege that either Defendant created a dangerous situation that would impose a duty on either to act. Mague appears to argue a "special relationship" between her and Fish and her and Drake based on her romantic relationship with Fish, and that they took advantage of her, which is a breach of their duty to her in light of that special relationship. The court does not find merit in this argument.

No Maine caselaw can be found that recognizes a special or fiduciary relationship between a husband and wife, let alone unmarried, cohabitating partners. Nor can a duty to not "take advantage" of a person be found to exist absent a fiduciary relationship. The court declines to find that a special relationship exists between unmarried and cohabitating partners. The court also declines to find a special relationship between an unmarried, cohabitating partner and the other partner's mother. Without a special relationship, there is no duty owed. The court grants summary judgment to the Defendants as individuals on Mague's negligence claim.

**Unjust Enrichment – Count V**

Mague asserts her unjust enrichment claim against all Defendants. Fish argues that Mague's actions did not enrich him. He alternatively argues that if he was enriched it was not unjust because Mague was provided a home to live in rent-free for the duration of their relationship, he contributed the bulk of the money to build the home, and he provided roughly the same amount of labor to build the home as Mague did. He further argues that Mague's unjust enrichment claim against anything that occurred more than six years before she filed her Complaint is barred by the statute of limitations. Finally, the

14

Defendants argue that Mague's employment relationship with them precludes her from pursuing an unjust enrichment claim against them under Maine precedent.

Mague argues that Fish was unjustly enriched because she stopped her own home construction project to advance Fish's. She additionally argues that the Defendants were unjustly enriched by keeping "the full value of the businesses." Mague finally argues that the statute of limitations on an unjust enrichment claim does not begin until the benefit is retained, which occurred on the day that Fish ended their relationship, not when the house was built.

"Unjust enrichment describes recovery for the value of the benefit retained when there is no contractual relationship, but when, on the grounds of fairness and justice, the law compels performance of a legal and moral duty to pay." *Aladdin Elec. Assocs., v. Town of Old Orchard Beach*, 645 A.2d 1142, 1145 (Me. 1994) (quoting *A.F.A.B., Inc. v. Town of Old Orchard Beach*, 639 A.2d 103, 105 n.3 (Me. 1994)). A plaintiff must show three elements to establish a prima facie claim of unjust enrichment:

> [1] a benefit conferred upon the defendant by the plaintiff;
> [2] an appreciation or knowledge by the defendant of the benefit; and
> [3] the acceptance or retention by the defendant of the benefit under such circumstances as to make it inequitable for the defendant to retain the benefit without payment of its value.

*Aladdin Elec. Assocs.*, 645 A.2d at 1145.

## A. Mague's Unjust Enrichment Claim Against the Defendants as Employers

The Defendants cite to *In re Wage Payment Litigation v. Wal-Mart Stores, Inc.*, 2000 ME 162, 759 A.2d 217 as precluding Mague's claim for unpaid, or underpaid, wages. There, hourly workers that were paid bi-weekly brought suit against their employers for violation of Maine's employment and wage statutes, the Federal Fair Labor and Standards Act, and for unjust enrichment under the common law. *Id.* ¶¶ 1-2. The

15

plaintiffs had agreed to consolidate the cases and the defendant employers filed a consolidated motion to dismiss, which the trial court granted in its entirety. *Id.* ¶ 2. The plaintiff employees filed a consolidated appeal. *Id.*

The Law Court easily affirmed the trial court's dismissal of the unjust enrichment claims. *Id.* ¶¶ 19-20. The Court focused on the fact that there was a contractual relationship between the employer and employees, which created an employment relationship. *Id.* ¶ 20. The Law Court did not address whether the employment contract was express or implied, but did cite to a case that determined when a contract for employment is for an indefinite, unmeasurable period of time, it is terminable at will.[8] Because there was an employment contract between the parties, the employees were precluded from bringing an unjust enrichment claim against their employers. *Id.* ¶ 20.

Fish cites to *Lunt v. Fidelity & Casualty Co.* for the proposition that "a sufficient contract of employment is created by a mutual agreement that one is to labor in the service of another, and that the question of compensation is not material." 139 Me. 218, 224, 28 A.2d 736, 739 (1942) (citation omitted). In the case at bar, the record is not clear whether there was a written employment contract. In her deposition, however, Mague testified that she was paid each year for her work with Longreach Corporation and SDRE. (SMF ¶ 48.) In her Opposition, Mague asserts that "there was no employment contract." She maintains that this was a "business arrangement" between the parties, and not an employer/employee relationship.

Despite Mague's claim that there was no employment contract, under these circumstances, working in exchange for pay amounts to a terminable at will employment contract under Maine law per *Lunt*, 139 Me. At 224, 28 A.2d at 739. Further, although

---

[8] *Burnell v. Town of Kingfield*, 686 A.2d 1072, 1073-74 (Me. 1996).

Mague is asserting some sort of ownership in the businesses, she testified that although she discussed with Fish making her an owner in one of the businesses, he was never in favor of that. (SMF ¶ 14.) Mague qualifies this Fact with the argument that although Fish "did not ever offer Jessica take ownership in the stakes, he did refer to them as "[o]ur business and our clients." It is unclear what sort of "business arrangement" this could create other than an employee/employer relationship. Mague baldly asserts there was no employment contract, but she does not refute that an agreement existed where she would work in exchange for pay. Her assertion that Fish spoke of "our business and our clients" does not bolster a claim of partnership because she admits that Fish denied her any share in the business, and she does not assert any partnership claim under Maine's Uniform Partnership Act, 31 M.R.S. §§ 1001-1105.

The record does not clarify whether Mague was paid by Longreach only, or if she was also paid by SDRE. Whichever company she was paid by and accepted funds from, created an employer-employee relationship with that company. Because her Complaint references her being paid by Longreach, there was an employer-employee relationship between Longreach, Fish, and Mague that precludes her from bringing an unjust enrichment claim against them. In the same vein, Mague's unjust enrichment claim against SDRE and Drake is precluded because her Complaint references that she was "at all times officially employed through Longreach Corporation . . . as well as working for SDRE through Longreach. . . " (Compl. ¶ 53 n.3.) Mague admits she was paid for that work by Longreach even if she was subcontracted out to SDRE.

Because she was paid for all of her work by Longreach, regardless of which business it was performed for, there has been no unjust enrichment of any Defendant. Further, a contractual employer-employee relationship existed between Mague and

17

Longreach and Fish that precludes her unjust enrichment claim. Summary judgment is granted to the Defendants in their employment capacities on Count V, unjust enrichment.

## B. Mague's Unjust Enrichment Claim Against Fish Individually

Mague alleges that she conferred a number of benefits on Fish and it would be inequitable to allow him to keep those benefits without compensating her for their value. Fish relies on his nearly equal labor in constructing the home and almost total financing of it as reasons why it would not be unjust for him to keep the benefits.

Mague gave up construction of her own home to "combine her efforts with [Fish] to build a joint home of the parties." (PASMF ¶ 7.) Her efforts included contributing countertops, a door, and a window to the home. (PASMF ¶ 13.) Mague provided cash to pour the foundation of the barn, physical labor in building the home, and intellectual labor in designing the home, (PASMF ¶¶ 11-13.) Mague testified that she and Fish agreed to the arrangement of Fish paying for the home, while Mague would help design and build it. (PASMF ¶ 14.)

The court first addresses Fish's statute of limitations argument because it determines whether Mague can claim unjust enrichment for her contributions to the home, which is the bulk of her claim. The general six-year statute of limitations applies in civil claims of unjust enrichment. *See Estate of Miller*, 2008 ME 176, ¶ 28, 960 A.2d 1140. "A cause of action accrues at the time judicially cognizable injury is sustained." *Id.* ¶ 25 (quotation marks omitted). In torts, a judicially cognizable injury is sustained at "the point at which a wrongful act produces an injury for which a potential plaintiff is entitled to seek judicial vindication." *Gile v. Albert*, 2008 ME 58, ¶ 8, 943 A.2d 599.

It is clear that in the case at bar, there was no wrong in 2007 through 2009 when the house was being built, and the years following when Mague and Fish lived together in a home that they both contributed to, under whatever agreement worked for them in

18

their relationship at that time. Before 2016, no wrongful act occurred which produced an injury entitling Mague to bring suit. After the couple's 2016 split, Fish did not pay Mague anything for her contributions to the home which at that point he solely owned and occupied. This entitled her to seek judicial vindication. Therefore, Mague's unjust enrichment cause of action arose in 2016[9] and is not barred by the statute of limitations.

Although the failed relationship is a wrinkle in this case, it does not preclude an action for unjust enrichment. In *Thibeault v. Brackett*, a couple was never married, but moved to property that the defendant bought solely in his name. 2007 ME 154, ¶ 1, 938 A.2d 27. There, the deed was only in the defendant's name, and the parties intended the property to belong only to the defendant. *Id.* ¶ 2. The plaintiff and her daughters lived with the defendant in the property from the time he bought it until six years later. *Id.* While living together, both parties "put money into converting the hunting shack that existed on the property at the time of purchase into a three or four bedroom home worth, in [the defendant's] estimation, about $150,000." *Id.* ¶ 3. The parties worked rarely, or not at all, but periodically had money available that they used for the improvements. *Id.*

---

[9] Fish's cite to *Flannery v. Lajoie*, BCD-CV-11-34, 2012 LEXIS *20 (Bus. & Consumer Ct. Mar. 7, 2012, *Horton, J.*) is unavailing. There, the plaintiff's unjust enrichment claim was based on his paying a mutual debt to a third party on behalf of the defendant, on the understanding that the defendant would repay him for his share of the debt. *Id.* at *1-2. The court described the unjust enrichment claim as accruing when the enrichment occurred, namely when the plaintiff paid the third party on behalf of both himself and the defendant. *Id.* at *6. The court explained that the enrichment occurred when the payment was made. *Id.* Although the court did not explain it outright, it is commonsense that the defendant's enrichment was unjust and inequitable at the time the payment was made, because it was at that time he received a benefit that would be unfair for him to keep without paying the plaintiff for its value. Here, because of the nature of the case, there was a lapse in time from when the benefit was conferred upon Fish to when it later became potentially unjust for him to keep the benefit without any payment to Mague. To accept Fish's reasoning would mean that parties in a case such as this could be in a successful nonmarital relationship for decades, and upon dissolution of that relationship, no claim for unjust enrichment could be maintained, no matter how inequitable the circumstances, because of the statute of limitations. The court declines that outcome.

After the relationship ended, the plaintiff brought suit against the defendant on an unjust enrichment claim, among others, "arising out of her contributions to the improvement and rehabilitation of the home, and claiming $100,000 in damages." *Id.* ¶ 4. The trial court found that the defendant had been unjustly enriched and awarded the plaintiff damages. *Id.* ¶ 5. On appeal, he argued that the trial court erred in determining that he was unjustly enriched. *Id.* ¶ 13.

In reviewing the trial court's factual findings, the Law Court found

> evidence in the record to support the court's finding that [plaintiff] conferred a benefit on [defendant] by contributing money to improve his home, held in his name alone, from a hunting shack to a home worth over $100,000 more than the purchase price. Although the court found it difficult to determine exactly who paid for what, [defendant] himself admitted that [plaintiff] made contributions and [she] presented receipts, invoices, and testimony regarding her contributions. In addition, there is evidence in the record that [defendant's] income alone would have been insufficient to make all of the improvements; he was working rarely, if at all, and lived only on disability, an accident settlement, and proceeds from sporadic vehicle sales. Although [plaintiff] was motivated to make improvements for her two daughters, the money she put into the home benefited [defendant] because he alone owned the property.

*Id.* ¶ 15. The Court found evidence in the record supporting that the defendant was aware of the benefit the plaintiff conferred on him, because although the parties disagreed on the amount of plaintiff's contributions, the defendant testified that she did in fact contribute to the improvements to the house. *Id.* ¶ 16. The defendant was aware of the benefit, despite his testimony that he "he had initially discouraged [the plaintiff] from contributing, expressing that he wanted the house to be all his, that he had already been through hard times with women, and that he wanted to avoid a situation like this one." *Id.* Finally, record evidence supported that the defendant keeping the benefit, without payment of its value, would be unjust. *Id.* ¶ 17. This would be because the defendant

> now owns and occupies the home to which the court found [the plaintiff] contributed thousands of dollars in improvements. He has not paid [the

plaintiff] anything in return and, although she did live with him rent-free for six years, she also contributed to household expenses during that time.

*Id.*

The elements of unjust enrichment are questions of fact. Therefore, whether it would be inequitable for a defendant to keep a benefit conferred on him by a plaintiff, or if there was a benefit conferred at all, is a question for the jury. The case at bar presents complicated questions of fact that do not lend themselves to summary judgment. Although it is undisputed that Fish contributed nearly all of the capital to build and maintain the home, Mague did provide labor, some materials towards the home, and some cash to the barn. She contributed to household expenses and maintenance. She took a lower salary from Longreach as a way to contribute to the home. Because it must be up to a factfinder to determine if it would be inequitable to allow the Fish to keep these benefits without paying Mague anything in return, the Defendants' Motion for Summary Judgment is denied as against Fish in his personal capacity for benefits conferred upon through her contributions towards the home and property. To the extent that Mague pursues an unjust enrichment claim based on the everyday trivialities that come from being in a relationship, such as providing emotional support and performing household chores, the court grants Fish summary judgment on those specific claims as no reasonable jury could find that Fish was unjustly enriched by retaining those specific benefits. [10]

## Conversion – Count VIII

Mague maintains her conversion claim against all Defendants. Mague alleges that she provided "significant materials and designs to the home and property, as[] well to

---

[10] Although Mague alleged her unjust enrichment claim against all Defendants, she did not allege any facts that Drake was individually unjustly enriched. The court considers this claim against Drake waived, and grants her summary judgment in her individual capacity on Count V.

21

the businesses."[11] She asserts that the "nature of the relationship and the promises made are a crucial aspect of [her] claim." The Defendants argue that there is no evidence they intentionally deprived Mague of property and also that any contributions she made to the construction of the home were voluntary. Fish also argues that if Mague is claiming that he converted the elm wood in the house, he could not have, as it was a gift from Mague's mother.

A conversion claim is properly asserted when the plaintiff shows (1) a property interest in the property, (2) a right to possession of the property at the time of the alleged conversion, and (3) a demand for the return of the property that was denied by the holder. *Estate of Barron v. Shapiro & Morley, LLC*, 2017 ME 51, ¶ 14, 157 A.3d 769. If the circumstances show that a demand of the property would be useless, no demand is necessary. *Bradford v. Dumond*, 675 A.2d 957, 962 (Me. 1996). Conversion boils down to "the invasion of a party's possession or right to possession at the time of the alleged conversion." *Withers v. Hackett*, 1998 ME 164, ¶ 7, 714 A.2d 798.

Maine law has not specifically addressed conversion of intellectual property. The Law Court has upheld a conversion claim for intangible property such as bank stocks. *Ocean Nat'l Bank v. Diment*, 462 A.2d 35, 40 (Me. 1983). In addressing intangible property, the Court has explained that

> [c]onversion may extend to certain types of intangibles, for example a right to payment, or a right to withdraw funds, that are 'customarily merged in or identified with some document,' Restatement (Second) of Torts, § 242,[12] such as a promissory note or bank book. The unfair use and appropriation

---

[11] In her briefing, Mague never specifies any physical items she claims were converted. It is unknown to the court whether it was lumber, windows, or other items that she listed in her complaint. Nor does she list anything more specific than "intellectual property."

[12] Comment b. explains that the merged-document rule "is applicable to promissory notes, bonds, bills of exchange, share certificates, and warehouse receipts, whether negotiable or non-negotiable. It is also applicable to insurance policies and to savings bank books."

of information that is not customarily merged in a particular document is more appropriately addressed by other remedies, including those created for unfair competition or misappropriation of trade secrets.

*Ne. Coating Techs., Inc. v. Vacuum Metallurgical Co.*, 684 A.2d 1322, 1324 (Me. 1996).

## A. Mague's Conversion Claim for Intellectual Property

Mague's conversion of intellectual property claim against the Defendants fails for a number of reasons. First, as against the Defendants as employers, she was paid for her work, which negates the first and second element of conversion. Once she was paid for her work, her employer had the right to possession, and a property interest in the intellectual property, not Mague. Next, applicable to all Defendants, her claim does not fall within the Restatement (Second) of Torts definition of conversion of intangible property, as she does not allege "intangible rights of the kind customarily merged in a document." § 242(2). Further, Mague does not claim that she demanded the return of her intellectual property from the Defendants and was denied. In short, Mague meets none of the elements for a conversion claim against the Defendants for intellectual property. The Defendants' Motion for Summary Judgment is granted as it relates to Mague's claim for conversion of intellectual property.

## B. Mague's Conversion Claim for Physical Property

Although Fish is correct that conversion is an intentional tort, "[t]he converter need not intend any conscious wrongdoing, as conversion entails an intent to exercise a dominion or control over the goods which is in fact inconsistent with the plaintiff's rights." *Ocean Nat'l Bank*, 462 A.2d at 39 (quotation marks omitted). "The gist of conversion is the invasion of a party's possession or right to possession at the time of the alleged conversion." *Withers*, 1998 ME 164, ¶ 7, 714 A.2d 798.

Here, the facts are undisputed that Mague contributed at least some items to be integrated into the home during its construction. It is also undisputed that she did so

23

under the belief that she was building a home with a lifetime partner. Her belief proved to be incorrect, but this court finds no caselaw that lends support to her conversion claim for these items. Most conversion caselaw addresses individual pieces of personal property, not property that has since been integrated into a home and become part of the real property. The argument that Mague puts forth regarding her motivation behind voluntarily contributing these items to the home is more suited to her promissory estoppel claim. Moreover, Mague never denies that she voluntarily contributed these items to the construction. It follows that, as a matter of law, there can be no invasion to her right of possession at the time of the alleged conversion, because at the time of the breakup, when she would have demanded the property back, she would have had no specific property interest in the items as she had already voluntarily contributed them to the home and they became part of the real estate. [13]

The facts of this case do not fit neatly into any Maine conversion caselaw. Despite this, there are no material facts in dispute for a factfinder to decide. Therefore, this court determines that because Mague voluntarily contributed the goods to the construction of the home, she had no right of possession to them at the time of the breakup. Mague's claims are more properly addressed through unjust enrichment and promissory estoppel theories, which she has brought, and are going forward in some capacity. The Defendants' Motion for Summary Judgment on Count VIII, conversion, is granted.

---

[13] Mague never identified any tangible property she contributed to the businesses other than to describe it as "significant materials." Because Mague does not specify what was converted or show evidence that she made a demand for the "significant materials," her claim against the Defendants as employers fails for any tangible property she is seeking as well. On the same note, Mague never alleged that Drake individually converted any of her tangible property. Drake is granted summary judgment in her individual capacity on the conversion claim.

24

## Civil Conspiracy – Count XII

Mague asserts her civil conspiracy claim against all the Defendants. Mague contends that Fish's statement to her during the break up that "if she had only gotten along with his mother, things would have been different" can only be inferred to mean that Fish and Drake engaged in a conspiracy against her. The Defendants contend that Mague has no evidence to support her conspiracy claim, only conclusory speculation, which warrants summary judgment.

The Law Court has not enunciated the elements of civil conspiracy. The Superior Court provides five elements a plaintiff must show to maintain a civil conspiracy claim: "(1) two or more persons; (2) an object to be accomplished; (3) a meeting of minds on the object or course of action; (4) one or more unlawful acts; and (5) damages." *Smith v. Coyne*, No. CV-03-405, 2004 Me. Super. LEXIS 120, at *11 (Apr. 12, 2004). "[A]bsent the actual commission of some independently recognized tort, a claim for civil liability for conspiracy fails." *Potter, Prescott, Jamieson & Nelson, P.A. v. Campbell*, 1998 ME 70, ¶ 8, 708 A.2d 283.

At this juncture, the court has granted Drake, SDRE, and Longreach summary judgment on all the claims that Mague has asserted against them. Because there are underlying torts against Fish that survive summary judgment, the court addresses Mague's civil conspiracy claim. In her deposition, Mague testified that

> [i]t appears at this point that [Fish] planned ahead to absorb my labor and assets free of charge and easily dispense of me and replace me with a new partner. He told me that if I had gotten along with his mother he wouldn't be leaving me. Whatever relationship that is or discussion they had that manifested in that statement, I don't know, but they obviously . . .

Pl.'s Ex. A 183:7-14. In response to defense counsel asking if it was Mague's belief that Fish and someone else got together at some point to undertake actions against her, she replied, "I understand that it's a possibility, yeah." Pl.'s Ex. A. 183:21-25. She finally

testified that Fish stated things would have turned out differently if she had gotten along with his mother, she believes that was part of why he broke up with her, and that Drake and Fish "might have discussed that issue." Pl.'s Ex. A part 2 345:17-346:4. None of this is disputed. The question is whether Mague has shown a prima case for each element of civil conspiracy.

Plaintiff does not offer evidence that shows an object to be accomplished or a meeting of the minds on the object or course of action. First, she testified that "it appears" Fish planned ahead to absorb her assets and labor free of charge and then to replace her. This is, as the Defendants argue, speculation. Despite Mague's argument to the contrary, Fish's statement that things would have turned out differently if Mague had gotten along with his mother does not permit a singular inference that Fish and Drake formulated an object to be accomplished, and a meeting of the minds on that object, or a course of action to accomplish it.

Mague does not provide any record evidence that supports a meeting of the minds between Fish and Drake, and when her counsel asked her if she knew, or if she believed, that Fish and Drake had a conversation regarding him breaking up with her, she stated that she "believed" they might have discussed that. Without something more, a belief that two people conspired against you is not enough to support a civil conspiracy claim. Moreover, Mague does not claim that Drake and Fish discussed his alleged plan of absorbing her assets and labor free of charge, only that they discussed Mague's relationship with Drake and that discussion may have formed part of the reason that he broke up with her. Because Mague does not make a prima facie case of the elements of civil conspiracy, the court grants the Defendants summary judgment on this claim.

26

## CONCLUSION

The Judgment is:

Defendants' Motion for Summary Judgment on all counts against Drake, SDRE, and Longreach is GRANTED.

Defendants' Motion for Summary Judgment against the Plaintiff is GRANTED in part and DENIED in part. Defendant Fish is DENIED summary judgment on Count I, promissory estoppel, so far as it relates to the equity in the home and related issues, but is GRANTED summary judgment on Count I in all other aspects, including for unpaid wages. Defendant Fish is DENIED summary judgment on Count V, unjust enrichment, as it relates to the home and associated outbuildings. Defendant Fish is granted summary judgment on all of the Plaintiff's other claims in their entirety.

The Clerk is directed to incorporate this Order by reference into the docket for this case pursuant to Maine Rule of Civil Procedure 79(a).

Dated: May 30, 2019

Daniel I. Billings, Justice
Maine Superior Court

27